FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

SEP 1 9 2019

JAMES N. HATTEN, Clerk
By: ⟋⟋⟋⟋ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHELLE TURNER,

      Plaintiff,

    v.

RONALD FREEMAN, et al.,

      Defendants.

CIVIL ACTION NO.

2:18-CV-187-RWS

## ORDER

This case comes before the Court on Defendants' Renewed Partial Motion to Dismiss [11]. The Court has carefully reviewed the record, and, for the reasons set forth below, the Defendants' Motion is GRANTED.

## Background

In this civil rights case, Plaintiff Michelle Turner claims that the various Defendant officers violated her constitutional rights by arresting her without cause and then holding her in jail under conditions that infringed on her privacy. Because this is a motion to dismiss, the facts below are presented as she alleges.[1]

---

[1] Plaintiff's counsel amended the Original Complaint [1], but the Amended Complaint [7] contained only one updated paragraph and an attached exhibit. [7, Ex. A]. Plaintiff's counsel subsequently attached two exhibits to the Response to this motion [10, Exs. A,B] and asks that the Court treat them as part of the pleadings, stating they are authentic and

### 1. Initial Arrest for Trespass

On June 8, Ms. Turner was invited by Thomas Langley to come to his house to return some of his effects. She did so. However, once she arrived, Langley called the police. He had, earlier that day, obtained a temporary protective order against Turner, but he had not told her about it.

Officer Amos, along with Officers Hubbard and Starr, responded to the call to investigate a trespass. As they approached the neighborhood, they were told by dispatch that Turner had left, and they got a description of her car. Officer Amos saw the car and followed it. He later wrote that it appeared that Turner was "attempting to evade" him. He pulled her over.

When asked about being at Langley's house, Turner "readily admitted" she had been there but said she was only there "to get her things" and that Langley had been very rude to her. Officer Amos didn't ask her whether she had been invited by Mr. Langley. When he ran her identification through his system, the system indicated that Ms. Turner had a warning for trespass at Mr. Langley's house issued

---

central to her claims. See U.S. ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 (11th Cir. 2015). The Defendants do not oppose the request. Accordingly, the Court will consider the documents. This approach, however, is not entirely straightforward, because the exhibits are at times inconsistent with some of Turner's allegations. The Court has endeavored to read them as consistent with the allegations where plausible. See F.R.C.P. 8(e). The Court reminds Plaintiff's counsel that this approach is not favored. See Osheroff, 776 F.3d at 811 ("A court generally may not look beyond the pleadings.").

on June 6, two days prior. When asked about the warning,[2] Turner replied that she "was never told to stay away from the house." Nevertheless, Officer Amos then arrested her for trespass.

## 2. Subsequent "Arrest" for Crossing Guard Lines with Drugs

Officer Amos transported her to the Forsyth County Jail, where she was booked. At the time she entered, she had with her the drug Alprazolam (commonly known as Xanax), which she had been prescribed by a doctor. Officer Nguyen discovered the drugs. He reported them to Officer Edmonson, who charged Turner with crossing guard lines with drugs. The charges were later dismissed.

---

[2] This is among the thorniest of the fact issues referred to in n.1, above. The discrepancy is summarized below:

Turner alleges that no such warning had been issued to her on June 6. [Dkt. 7 at ¶ 12]. She alleges that Officer Amos asked about the TPO, rather than the trespass warning. [Dkt. 1 at ¶ 10]. She alleges that this was the first she had heard of the TPO. [Id. at ¶ 8]. She alleges that the warning was retroactively added to her file. However, she also recites (and now incorporates) his incident report, which clearly refers to a "criminal trespass warning issued by Deputy Green on 6/6/2018." [Dkt. 1 at ¶ 11; Dkt. 10, Ex. B]. She also attached to her Amended Complaint Deputy Green's report of the June 6 encounter, which concludes by stating, "criminal trespass issued." [Dkt. 7, Ex. B at 3].

To explain the discrepancy, she alleges that the warning was retroactively added to the June 6 report. She bases this claim on a line in the report's "Event Log," which appears to be automatically generated, which says, "Missing InciNotes Repaired" and is dated 6/14/18. [Id.]. She does not explain why the warning showed up in the June 8 Report, though presumably she would allege that it was also added retroactively. Considering the content of the reports, her explanation strains credulity. Because it was Plaintiff Turner who asked the Court to consider the additional documents, which contradict her own allegations, the Court has determined to read them in the most sensible manner, which is that the warning was included on the June 6 report and was seen by Officer Amos.

### 3. Placement on Suicide Watch

That night in jail, Turner was extremely upset because she'd never been arrested before. In response, Officers Nguyen and Clack claimed that she was suicidal, though she had made no threats to harm herself. About three hours after she arrived, they put her on "suicide watch."

She was placed by herself in a padded cell with nothing but a hole for a toilet. The guards took away her clothes and dressed her in a suicide gown. The gown did not cover her breasts, nor was it long enough to cover her private parts. Eventually, the gown tore and started to come undone until she was "almost completely naked." During her confinement, multiple men walked by and saw her exposed body.

The next morning, she was given her clothing to wear for her court appearance. But when she returned, she was again placed on suicide watch and given the same gown by her new guards, Officers Moise and Wareham. She asked them for a different gown, but they refused and insulted her. She was held overnight and released the following morning.

### 4. Procedural History

Turner brought claims under 42 U.S.C. § 1983 against all the officers involved for violations of her Fourth, Fourteenth, and Ninth Amendment Rights. In

her Complaint [1], she claims that she was unlawfully arrested for both the trespass and the charge of crossing the guard lines with drugs. She also claims that the conditions at the jail violated her right to privacy. In addition to suing the officers, Turner also sued Sheriff Freeman, claiming he is responsible for the policy governing suicide watch at the jail.

The Defendant officers filed a Partial Motion to Dismiss [4]. Turner then amended her Complaint [7] and a filed a Response [10] to the Motion. The Defendants renewed their Motion [11] and filed a Reply [12] to Turner's Response. Turner later filed a Response [16] to the Renewed Motion, to which the Defendants filed a Reply [17]. Although the original Motion was denied as moot [15] due to the Amended Complaint, the Court has reviewed the parties' briefs for both the original and the Renewed Motion.

The Defendants' Motion [11] targets both claims: unlawful arrest and a violation of the right to privacy. However, the scope of the latter is limited: the Defendants do *not* ask the Court to dismiss the privacy claim, except insofar as it is brought under the Ninth Amendment, which they believe cannot sustain it. Though they dispute Turner's allegations, they concede that, as currently pled, the privacy claim is better suited for summary judgment.

The Court now turns to the merits of their Motion.

## Discussion

For the claims subject to this Motion, the Defendant officers raise two arguments: they say that 1) Plaintiff Turner has failed to state a claim for which the Court can grant relief; and 2) as state officers, they are entitled to qualified immunity. For the reasons discussed below, the Court agrees.

### I. LEGAL STANDARDS

#### A. Failure to State a Claim

To avoid dismissal under Rule 12(b)(6), a "complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is "plausible on its face" when the facts support a "reasonable inference that the defendant is liable for the misconduct alleged." Id.; Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018).

To make this determination, the Court "accept[s] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." Gates, 884 F.3d at 1296. By contrast, the Court ignores legal conclusions or factual contentions masquerading as legal conclusions. Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."). If the Plaintiff has stated facts that support relief, the claim proceeds. If not, it ends.

### B. Qualified Immunity

Qualified immunity protects government officials if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Hope v. Pelzer, 536 U.S. 730, 739 (2002); Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018). When a defendant asserts qualified immunity, the plaintiff must show both that (1) her constitutional right was violated and (2) the right was clearly established.[3] The Court can address the issues in either order. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

For a right to be clearly established, the law must be clear enough to give the officers "fair warning that [the] conduct deprived [the] victim of a constitutional right." Hope, 536 U.S. at 739–40; see also Gates, 884 F.3d at 1296; Fish v. Brown, 838 F.3d 1153, 1162 (11th Cir. 2016). "Fair warning" can come about in one of three ways: (1) a "specific enough" federal statutory or Constitutional provision; (2) case law from the Supreme Court, the Eleventh Circuit, or the Georgia

---

[3] A defendant asserting qualified immunity has an initial burden to show he was acting within the scope of his discretionary authority. Gates, 884 F.3d at 1297. Here, however, that threshold issue is undisputed.

Supreme Court stating that the conduct is unconstitutional "without tying that determination to a particularized set of facts"; or (3) case law from one of those courts stating that the conduct is unconstitutional under certain circumstances that are "materially similar" to those in the current case. See Fish, 838 F.3d at 1163 (citing Vinyard v. Wilson, 311 F.3d 1340, 1350–52 (11th Cir. 2002). The third category of precedents is the most common. Id.

### C. Intertwined Standards

"Although the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." Corbitt v. Vickers, 929 F.3d 1304, 1311 (11th Cir. 2019) (internal quotations omitted). At this stage, "the qualified immunity inquiry and the Rule 12(b)(6) standard become intertwined." Keating v. City of Miami, 598 F.3d 753, 760 (11th Cir. 2010). Thus, a court will grant the motion to dismiss if "the complaint fails to allege the violation of a clearly established constitutional right." Corbitt, 929 F.3d at 1311.

\* \* \*

In the Parts below, the Court applies these standards to the claims challenged by the Defendants.

## II. COUNT ONE: UNLAWFUL ARRESTS

In Count One, Turner complains that both of her arrests—for trespass and for carrying drugs across guard lines—were invalid and thus violated her Fourth Amendment rights.[4] Although raised as one Count, the two arrests constitute separate claims and will be addressed separately. See Fish v. Brown, 838 F.3d 1153, 1164 (11th Cir. 2016). The Defendant officers argue that both must be dismissed. For the reasons below, the Court agrees with the Defendants.

### A. Arguable Probable Cause

For a claim of unlawful arrest under the Fourth Amendment, the law in this Circuit is clear: the key question is whether, at the time of the arrests, the Defendant officers had (1) probable cause, (2) *arguable* probable cause, or (3) neither. If they had probable cause, the arrest did not violate the Fourth Amendment, and Turner's claim necessarily fails. See Gates v. Khokhar, 884 F.3d 1290, 1297 (11th Cir. 2018) (probable cause is an "absolute bar"). If they had *arguable* probable cause, then qualified immunity protects the officers. See id. at 1298. Either way, the claims fail under Rule 12(b)(6). If, however, the officers had neither, then her claims survive.

---

[4] Although Turner styled her allegations as violations of the Fourth, Ninth, and Fourteenth Amendment, the claim for unlawful arrest arises only under the Fourth.

Probable cause exists "where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Id. The standard is "practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007). Because it requires only a "probability" of criminal activity, "innocent behavior" may well provide a basis for probable cause. Gates, 884 F.3d at 1298.

Arguable probable cause is broader. It exists "where reasonable officers in the same circumstances and possessing the same knowledge as the defendant *could* have believed that probable cause existed to arrest." Id. (emphasis in original).[5] The inquiry necessarily "depends on the elements of the alleged crime and the operative fact pattern." Id. But establishing arguable probable cause "does not . . . require proving every element of a crime." Id. at 1300.

---

[5] Arguable probable cause is the Eleventh Circuit's effort to reconcile two ideas: on one hand, "[i]t is clearly established that an arrest made without probable cause violates the Fourth Amendment." Wilkerson v. Seymour, 736 F.3d 974, 977 (11th Cir. 2013). On the other, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." Anderson v. Creighton, 483 U.S. 635, 641 (1987).

Because the broader standard resolves this motion, the Court considers only whether the officers had *arguable* probable cause for each arrest at the time it was made. The Court "appl[ies] this objective reasonableness standard to the facts as they relate to the elements of the alleged crime[s] for which the plaintiff was arrested." Carter v. Butts Cty., Ga., 821 F.3d 1310, 1320 (11th Cir. 2016). And, as the sections below show, the standard is readily met for both arrests.

### B. Initial Arrest for Trespass

Turner was initially arrested for criminal trespass by Defendant Officer Amos.[6] In Georgia, a person commits trespass if he "knowingly and without authority . . . [e]nters upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner [or] rightful occupant . . . that such entry is forbidden." O.C.G.A. § 16–7–21(b)(2). Because Turner readily admitted to knowingly entering the premises, Officer Amos needed, at most, arguable probable cause *only* that such entry was (1) "without authority" and (2) "after receiving . . . notice."

The facts alleged establish both:

- On June 6, two days before the arrest, Thomas Langley called the police and informed them that Turner was trespassing on his property.

---

[6] Amos was allegedly assisted by Officers Hubbard and Starr. Because Amos is entitled to qualified immunity, the Court does not address the liability of the other officers.

Forsyth County officers responded to the scene and issued a criminal trespass warning. [Dkt.7, Ex. B].
- On June 8, Langley again called police and informed them that Turner was trespassing. Before arriving, Officer Amos was informed that Turner had left and was driving a silver Hyundai SUV. [Dkt.10, Ex. B].
- Officer Amos saw the car and followed it. Turner "appeared" as if she was "attempting to evade." Officer Amos eventually pulled her over. [Dkt.10, Ex. B].
- The car tag returned to Langley's address. When asked, Turner admitted to being on the premises but stated "she was only there to get her things." [Dkt.10, Ex. B].
- Deputy Amos processed Turner's identification through the GCIC and local RMS system, which returned the June 6 criminal trespass warning. [Dkt.1 at ¶ 11; Dkt. 10, Ex. B].
- When asked about the warning, Turner stated "she was never told to stay away from the residence." [Dkt.10, Ex. B].

For both the elements of lack of authority and notice, these facts amount to arguable probable cause. Not only was he called to the scene to investigate a trespass, Officer Amos had documented evidence that Turner had been expressly warned just two days prior to stay away. With that in mind, a reasonable officer could have believed that Turner had trespassed.

Turner's arguments to the contrary are unavailing. She contends that "defendant Amos arrested [her] without any knowledge that she had any notice" [Dkt. 10, at 8] because she told him "she was never told to stay away from the residence." [Dkt. 10, Ex. B]. She also claims that he failed to investigate whether she was invited to Langley's house, which she claims she was. In essence, her

argument boils down to this: "that an officer may [not] assume [Plaintiff's] specific intent or that proper notice was given." [Dkt. 10, at 15]. For a couple of reasons, she misses the mark.

First, the repeated references to "specific intent" misstate the requisite level of criminal intent for criminal trespass. The statute is clear on its face that the *mens rea* is knowledge, not specific intent. See O.C.G.A. § 16–7–21(b)(2). According to Georgia's Supreme Court, "[o]ne charged with trespass cannot be convicted unless he is *aware* of his conduct . . . and *aware* of the attendant circumstances." Bowman v. State, 376 S.E.2d 187, 188 (Ga. 1989) (emphasis added).

More importantly, in determining probable cause, Officer Amos wasn't required to know her mental state. See Gates v. Khokhar, 884 F.3d 1290, 1300 (11th Cir. 2018) ("[W]e have never pronounced a rigid requirement that an arresting officer must have specific evidence of the subjective intent and knowledge of a subject beyond the subject's conduct that otherwise gives rise to probable cause to arrest."); Jordan v. Mosley, 487 F.3d 1350, 1356 (11th Cir. 2007) ("[T]he officer needs no specific evidence of the suspect's intent" to arrest a suspect).[7] It is true that an officer may not "ignore information that has been

---

[7] Gates involved a specific intent crime; Jordan involved a general intent crime. It follows that, for a knowledge crime, the burden on the officer here would be no higher.

to him or her." Carter v. Butts Cty., Ga., 821 F.3d 1310, 1321 (11th Cir. 2016); see also Cozzi v. City of Birmingham, 892 F.3d 1288, 1294 (11th Cir. 2018) (officer ignored differences in plaintiff's tattoos compared to description). But Officer Amos was not required to credit her statement above and against the other evidence he had before him. Considering the "totality of the circumstances," the facts he knew amounted to arguable probable cause.

This conclusion also squares with two Eleventh Circuit cases that deal with Georgia's criminal trespass statute and that set out clear examples of when arguable probable cause did—or did not—exist. First, in Osborne v. Am. Multi Cinema, Inc., the court found that the officer had arguable probable cause when he was told by a fellow officer that he had explicitly banned the plaintiff from returning to the premises. 348 F. App'x 535, 538 (11th Cir. 2009).[8] By contrast, in Carter, the court held that an officer clearly *lacked* arguable probable cause when he arrested workers who were foreclosing on his own home because he knew from at least two different sources that the workers were authorized to be there. 821 F.3d at 1321. The facts here—particularly the existence of the warning—mean that this case much more closely resembles Osborne than Carter. Cf. also Taylor-

---

[8] As an unreported case, Osborne is persuasive precedent for the Court.

Williams v. Rembert, 712 F. App'x 960, 962 (11th Cir. 2017) (officer had arguable probable cause when "he knew that [the plaintiff] had been given a trespass warning in the past which made her subsequent trespass criminal" under Florida statute (internal parentheses omitted)).

For these reasons, the Court finds that Officer Amos had arguable probable cause to arrest Turner for trespass. Defendants Amos, Hubbard, and Starr are therefore entitled to qualified immunity on the claim of unlawful arrest. Accordingly, Defendants' motion to dismiss this claim will be GRANTED.

### C. Subsequent Arrest for Crossing Guard Lines with Drugs

Turner also claims that she was unlawfully arrested by Defendant Officers Nguyen and Edmonson for crossing the guard lines with drugs.[9] Under Georgia law, it is unlawful "for any person to come inside the guard lines established at any jail with . . . any controlled substance . . . without the knowledge and consent of the jailer or a law enforcement officer." O.C.G.A. § 42-4-13(d)(1)(A). Turner concedes that she came inside the guard line with the drug Alprazolam, commonly

---

[9] In her complaint, Turner alleges that the charges were "maliciously instituted and maintained" [Dkt. 1 at ¶ 18], but she clarifies in her response that she was claiming only unlawful arrest, not malicious prosecution. [Dkt. 10 at 7, n. 8].

known as Xanax, which is a Schedule IV controlled substance under federal law. 21 C.F.R. § 1308.14(c)(2). She does not allege that any of the officers consented.

Instead, she alleges that she had a prescription for the drug and argues that the officers therefore lacked probable cause to arrest her. But the relevant statutory provision contains no exception for prescriptions. Turner points to a prescription-drug exception from a *different* part of the statute, subsection (f)(1), and says it ought to apply to her. See O.C.G.A. § 42-4-13(f)(1) ("unless such person has a valid prescription"). But that provision, as the Defendants correctly point out, involves a different situation—it refers to a person "under the influence" of a controlled substance rather than in possession of it—and is rightfully limited to that situation. Id. It does not apply to the crime for which she was arrested.

Because she crossed the guard lines with a controlled substance, a reasonable officer could—indeed would—have believed that Turner violated O.C.G.A. § 42-4-13(d)(1)(A). Officers Nguyen and Edmonson are entitled to qualified immunity. Defendants' motion to dismiss this claim will be GRANTED.

## III. COUNT TWO: VIOLATION OF THE RIGHT TO PRIVACY

In Count Two, Plaintiff Turner alleges that she was wrongfully placed on suicide watch and, as a result, subjected to degrading conditions of confinement. She claims that her right to privacy under the Fourth, Ninth, and Fourteenth

Amendments was violated by Defendant Officers Nguyen, Clack, Moise, and Wareham, who oversaw her confinement, and by Defendant Sheriff Freeman, who was responsible for the governing policy. Count Two comprises two distinct claims against the different Defendants. These are considered below.

### A. Violation of the Right to Privacy by the Guards on Duty

Turner's allegations of her confinement, if true, are troubling. She alleges that she was put on suicide watch despite making no claims that she would harm herself, that she was placed in a padded cell that was completely bare of anything and that included only a hole for her to relieve herself in, and that she was required to wear a flimsy suicide gown, which failed to adequately cover the private parts of her body and which eventually tore and came undone to the point where she was almost completely naked.

The Court takes Turner's allegations seriously. Most importantly for the purposes of this Order, Defendants have *not* moved to completely dismiss these allegations. Instead, their motion makes clear that they have moved to dismiss the claims against these officers only to the extent that they are brought as claims under the Ninth Amendment. Ultimately, as the parties recognize and discussion below demonstrates, this is a pleading issue rather than a merits issue.

In fact, there are multiple pleading issues. Turner clearly challenges the inadequacy of the gown. But, as the Defendants noted, based on her filings, it is unclear whether she is also claiming that merely being placed on suicide watch against her will was itself unconstitutional. For the sake of completeness, the Court addresses both claims separately.

### 1. Placement on suicide watch

Turner invokes a Georgia Supreme Court case, Zant v. Prevatte, for the proposition that the jailers violated her right to privacy by placing her on suicide watch when she wasn't suicidal. See 286 S.E.2d 715 (Ga. 1982). In Zant, the court held that the state could not force feed a prisoner who was on a hunger strike, noting that he, "by virtue of his right of privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life." Id. at 717. Turner wants to extend that principle to the facts here.

Whatever the merits of that argument, the issue here is—again—one of pleading, because Turner has *not* brought a claim for violations of the Georgia Constitution. The right of privacy in Zant derives from the Georgia Constitution, as both the Eleventh Circuit and the Supreme Court of Georgia have made clear. See Padgett v. Donald, 401 F.3d 1273, 1282 (11th Cir. 2005) (discussing a "right to bodily privacy under the Georgia Constitution" and citing Zant); Powell v. State,

510 S.E.2d 18, 22 (Ga. 1998) (same). Such a distinction cannot be overlooked because "[t]his right of privacy guaranteed by the Georgia Constitution is *far more extensive* than that protected by the Constitution of the United States." King v. State, 535 S.E.2d 492, 494 (Ga. 2000) (emphasis added). Such a right is not cognizable under the Federal Constitution.[10] That means the claim cannot proceed.

### 2. Exposure due to the inadequate "suicide gown"

The gown is a different story. In contrast to the above, the Eleventh Circuit has clearly established a *Federal* Constitutional right to "bodily privacy" for prisoners that protects them from the compelled exposure of their private parts. Boxer X v. Harris, 437 F.3d 1107, 1110–11 (11th Cir. 2006) (citing Fortner v. Thomas, 983 F.2d 1024 (11th Cir.1993)). In both Boxer X and Fortner, the court recognized that guards who compelled inmates of the other sex to expose their genitals violated the right. Id. The court explained that there is a "special sense of privacy in [a person's] genitals" such that "involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating." Id. (internal quotations omitted).

---

[10] Turner's reliance on King v. Butts Cty. Ga., 576 F. App'x 923 (11th Cir. 2014) is misplaced. While "failure to plead the correct legal theory is not necessarily fatal to a plaintiff's claim," that is only true "when the defendant has sufficient and fair notice of the correct theory." Id. at 931. Here, the Defendants were not on notice of a potential state law claim.

Those cases established a broad principle of clearly established law that applies here. See Mitchell v. Stewart, 608 F. App'x 730, 734–35 (11th Cir. 2015). In Mitchell, the female plaintiff claimed she was arrested, transported, and held in pretrial detention wearing only a sweater which exposed her breasts and did not cover her genitals. Id. at 732. The defendants argued that their case was different from Boxer X and Fortner because (1) the plaintiff was a woman and the guards were men, and (2) the plaintiff was a pretrial detainee instead of a prisoner Id. at 735. But the court dispelled those arguments: the Fortner right was not tied to specific circumstances; rather, it was a "broad, clearly established principle" that did not require a "materially similar case." Id. at 734–35. Although Mitchell does not itself clearly establish the law,[11] given its similarities to the facts here, the Court finds its explanation of the Fortner right extremely persuasive.

Accordingly, because Turner has alleged what amounts to compelled nudity, the officers would *not* be entitled to qualified immunity for the claim at this stage.

### 3. The Ninth Amendment

The only question then, for the purposes of Defendants' motion, is whether the Fortner right to privacy falls under the Ninth Amendment. Turner says it does.

---

[11] See J W by & through Tammy Williams v. Birmingham Bd. of Educ., 904 F.3d 1248, 1260 n.1 (11th Cir. 2018).

The Defendants disagree, citing to various district courts for the proposition that the Ninth Amendment offers no actionable § 1983 claim, though none of their cases address Fortner specifically. Most importantly, the Eleventh Circuit has not said. Cf. Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006) (right to bodily privacy *not* an Eighth Amendment right); Powell v. Barrett, 541 F.3d 1298, 1314 n.7 (11th Cir. 2008) (right to bodily privacy "*implicates*" the Fourth Amendment in the strip search context); Padgett v. Donald, 401 F.3d 1273, 1280–81 (11th Cir. 2005) (right to bodily privacy "*comports with*" the right to privacy established by the Supreme Court, which "exist[s] within the liberty component of the Fourteenth Amendment."). All considered, the question remains an open one.

It also proves more academic than practical, for answering would put the Court in the disfavored position of addressing a new constitutional issue that has very little, if any, impact on the case. (As the Plaintiff herself admits: "It is of course entirely possible that this is all beside the point." [Dkt. 10 at 3].) So, while the Court tends to agree that the liberty component of the Fourteenth Amendment Due Process Clause seems the proper Constitutional foothold for Fortner's right to bodily privacy, the Court declines to expressly resolve the issue here.

What is clear, however, is Turner has failed to identify authority establishing a right *under the Ninth Amendment* in particular. Cf. Walker v. City of Calhoun,

Ga., 901 F.3d 1245, 1257 (11th Cir. 2018) (citing Graham v. Connor, 490 U.S. 386, 394 (1989)) ("The validity of the claim must . . . be judged by reference to the specific constitutional standard which governs that right."). That's the challenge Defendants put before her in their motion.

Therefore, knowing that Turner's right to bodily privacy *is* clearly established under Fortner and that the case will proceed on that claim, the Court finds only that Plaintiff Turner has failed to state a claim arising under the Ninth Amendment against Officers Nguyen, Clack, Moise, and Wareham. Accordingly, Defendants' motion will be GRANTED as to that claim.

**B. Supervisory Liability for the Policy**

In addition to claims against the guards, Turner alleges that the inadequate gown was used "pursuant to the policy and practice of Defendant Freeman." This single line is the sole basis for the claim found in the complaint. The policy itself, which Turner later attached to her Response, includes a reference to "protective clothing" and prescribes the following "procedure": "Inmates who are deemed at risk will be dressed in a suicide prevention smock that promotes safety for the detention staff and prevents humiliation and degradation of the inmate." [Dkt. 10, Ex. A]. Turner argues that, because of the policy, Sheriff Freeman should be held liable as a supervisor.

The principles governing a supervisor's liability are well-established:

> [S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. Instead, to hold a supervisor liable a plaintiff must show that the supervisor either [1] *directly participated in the unconstitutional conduct* or that a causal connection exists between the supervisor's actions and the alleged constitutional violation . . . . The necessary causal connection can be established when [2] *a history of widespread abuse puts the responsible supervisor on notice* of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or [3] *policy . . . results in deliberate indifference to constitutional rights* or when facts support an inference that the supervisor [4] *directed the subordinates to act unlawfully* or knew that the subordinates would act unlawfully and failed to stop them from doing so.

Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1047–48 (11th Cir. 2014) (internal

citations omitted and emphasis added). This standard is "extremely rigorous" and

so sets a high hurdle for Turner to overcome. See id. at 1048.

The facts she alleged are not sufficient to establish any of the bases of

liability outlined above. Three avenues are easily disposed of: there is no allegation

that Sheriff Freeman directly participated in dressing Turner inadequately; there is

no allegation that he directed the officers to do so; and there is no allegation that he

was aware of a history of widespread abuse.

As for the potential liability for a policy that "results in deliberate indifference," that claim also falls short. The policy here explicitly states that the purpose of the gown is to "prevent humiliation and degradation," exactly the opposite of what Turner alleges. In her response, she reasons that, because there is a policy requiring a gown—or a "smock," as the policy states—and because her gown was inadequate, therefore the policy must be to provide inadequate gowns. But the conclusion does not follow the premises. Nothing suggests an actual link between the policy's prescribed procedure and the inadequacies of the gown she wore. Speculation cannot sustain this claim.

The Court is further guided by a countervailing consideration—namely, that the *failure* to protect suicidal prisoners from themselves can subject officials to liability. See Jacoby v. Baldwin Cty., 596 F. App'x 757, 765 (11th Cir. 2014) (citing Greason v. Kemp, 891 F.2d 829, 835–36 (11th Cir. 1990)) ("[F]ailure to take steps to prevent [an] inmate from committing suicide can amount to deliberate indifference."). To subject a policymaker to liability for setting out a facially neutral policy, absent some other allegation, would put him in a peculiar whipsaw.

A suicide-prevention policy is a good thing for a jail to have. That such a policy *could* direct, prescribe, or result in conduct that is degrading, invasive, or even abusive is manifest. But no facts alleged here support such a claim. Sheriff

24

Freeman cannot be held liable for the conduct of his officers. Accordingly, Defendants' motion to dismiss the claim against him will be GRANTED.

### Conclusion

For the reasons discussed above, the Defendants' Motion is **GRANTED**. The case will **PROCEED** on Plaintiff Turner's claim against Officers Nguyen, Clack, Moise, and Wareham that her gown exposed her in violation of her bodily right to privacy. Her other claims are hereby **DISMISSED**.

**SO ORDERED** this _19th_ day of September, 2019.

**RICHARD W. STORY**
United States District Judge